## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MATTHEW J. DAYAK, JEFFREY S. JACOBS and THOMAS DORE, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.:** |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| REYES HOLDINGS, LLC, THE BOARD OF DIRECTORS OF REYES HOLDINGS, LLC, REYES HOLDINGS, LLC EMPLOYEE BENEFITS COMMITTEE and JOHN DOES 1-30. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs ("Plaintiffs"), Matthew J. Dayak, Jeffrey S. Jacobs and Thomas Dore, by and through their attorneys, on behalf of the Reyes Holdings 401(k) Thrift Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Reyes Holdings, LLC ("Reyes" or "Company"), the Board of Directors of Reyes Holdings, LLC and its members during the Class Period[2] ("Board"), and the Reyes Holdings, LLC Employee Benefits Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

---

[1]  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2]  The Class Period, as will be discussed in more detail below, is defined as June 7, 2016 through the date of judgment.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98

(9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's

investment results over time because "[b]eneficiaries subject to higher fees … lose not only money

spent on higher fees, but also lost investment opportunity; that is, the money that the portion of

their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at

1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the

beneficiary's investment shrinks.").

7.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence

in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor

investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the

duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes*

*v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.     Most participants in defined contribution plans like 401(k) plans expect that their

accounts will be their principal source of income after retirement.  Although at all times plan

accounts are fully funded, that does not prevent plan participants from losing money on poor

investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees

or both.

9.     Prudent and impartial plan sponsors thus should be monitoring both the

performance and cost of the investments selected for their retirement plans, as well as investigating

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
center/publications/a-look-at-401k-plan-fees.pdf (last accessed November 29, 2021) ("You should
be aware that your employer also has a specific obligation to consider the fees and expenses paid
by your plan.").

alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.     At all times during the Class Period, the Plan had more than $645 million dollars in assets under management.  At the end of 2020 and 2019, the Plan had over $1.3 billion dollars and $1.4 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Reyes Holdings 401(k) Thrift Plan ("2020 Auditor Report") at 4.

11.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping and administration ("RKA") costs.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of

29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiffs**

18.     Plaintiff, Matthew J. Dayak ("Dayak"), resides in Palo Cedro, California. During his employment, Plaintiff Dayak participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below. Specifically, Plaintiff Dayak invested in the Reyes Target 2045 Fund complained

of, below. Plaintiff Dayak suffered injury to his Plan account by overpaying for his share of RKA costs and by investing in the poor performing and improperly constructed Reyes Target 2045 Fund.

19.     Plaintiff, Jeffrey S. Jacobs ("Jacobs"), resides in Lakeville, Minnesota. During his employment, Plaintiff Jacobs participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Specifically, Plaintiff Jacobs invested in the Hartford Mid Cap Class Y fund complained of, below. Plaintiff Jacobs suffered injury to his Plan account by overpaying for his share of RKA costs and by investing in the poor performing Hartford Mid Cap Class Y fund.

20.      Plaintiff, Thomas Dore ("Dore"), resides in Oceanside, California. During his employment, Plaintiff Dore participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.  Plaintiff Dore suffered injury to his Plan account by overpaying for his share of RKA costs. Specifically, Plaintiff Dore invested in the Hartford Mid Cap Class Y fund complained of, below. Plaintiff Dore suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs and by investing in the poor performing Hartford Mid Cap Class Y fund.

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available

alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

23.     Reyes Holdings, LLC ("Reyes" or "Company") is the Plan sponsor and a named fiduciary having a principal place of business as 6250 N. River Road, Suite 9000, Rosemont, Illinois.  The December 31, 2020 Form 5500 of the Reyes Holdings 401(k) Thrift Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Reyes describes itself as a "global leader in the production and distribution of food and beverage products."[4]

24.     Reyes appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Reyes Holdings 401(k) Thrift Plan Trust Agreement effective April 1, 2010 ("Trust Agreement") at 1. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, Reyes during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

26.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

---

[4] https://www.reyesholdings.com/about

**Board Defendants**

27.      Reyes, acting through the Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Trust Agreement at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.      Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

29.      The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

30.      A discussed above, Reyes and the Board appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Trust Agreement at 1. As will be discussed below, the Committee fell well short of these fiduciary goals.

31.      The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32.      The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

33.     To the extent that there are additional officers, employees and/or contractors of Reyes who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Reyes officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 7, 2016 through the date of judgment (the "Class Period").

35.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 24,254 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500 at 2.

36.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;
>
> C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of monetary relief.

38.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

39.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

41.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2020 Auditor Report at 6. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

42.     In general, all employees of Reyes are eligible to participate as soon as is administratively feasible after their date of hire. *Id.*

### *Contributions*

43.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

44.     With regard to employee contributions participants may "elect to contribute up to 50% of annual compensation on a pre or post tax basis, as defined in the plan document, subject

to certain Internal Revenue Code ("IRC") limitations." *Id.* With regard to matching contributions made by Reyes, Reyes will generally contribute "an amount equal to 50% of eligible participants' deferrals to a maximum matching contribution up to 10% of the eligible participants' deferrals …." *Id.*

45.     Like other companies that sponsor 401(k) plans for their employees, Reyes enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46.     Reyes also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

47.     Given the size of the Plan, Reyes likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

48.     With regard to contributions made by participants, participants "are immediately vested in the Plan for their own contributions plus actual earnings thereon." 2020 Auditor Report at 7.  Generally, contributions made by Reyes are subject to a five year vesting schedule. *Id.*

### *The Plan's Investments*

49.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

50.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

51.     The Plan's assets under management for all funds as of December 31, 2020 was $1,345,989,007.  2020 Auditor Report at 2.

### Payment of Plan Expenses

52.     During the Class Period, administrative and recordkeeping expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 8.

## VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.   The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

53.      As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

54.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

55.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in

the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

56.     In fact, in an attempt to discover the details of the Plan's mismanagement, on November 3, 2021, Plaintiffs, Matthew J. Dayak, Jeffrey S. Jacobs and Thomas Dore, wrote to Reyes requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated December 3, 2021, Reyes refused to provide any minutes in response to Plaintiffs' request.

57.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

58.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

59.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**(1)** **The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

60. A clear indication of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

61. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

62. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[6] (excluding the separate fee charged by an independent third-party auditor);

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

63.     This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

64.     The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

---

[6] The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

    A.  Loan processing;

    B.  Brokerage services/account maintenance (if offered by the plan);

    C.  Distribution services; and

    D.  Processing of qualified domestic relations orders.

65.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

66.    Here, John Hancock Retirement Plan Services ("Hancock") served as the recordkeeper through the Class Period. Hancock provided services in line with the routine bundled and A La Carte service categories described above. The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 37, 60, 62 and 64. Below are the definitions of the typical codes associated with recordkeeping including those reported by Reyes:

    15 - Recordkeeping and information management (computing, tabulating, data processing etc.)

    37 – Participant loan processing

    60 – Sub-transfer agency fees

    62 – Float revenue

    64 – Recordkeeping fees

    65 – Account maintenance fees

*See* Instructions for the 2020 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. Again, the above services are not out of the ordinary of the services other national recordkeepers provide.

67.    The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

68.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

69.    During the Class Period, many of the Plan's funds paid revenue sharing to the Plan's recordkeeper.

70.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*). "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

18

71.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

72.     In this matter, using revenue sharing or a combination of revenue sharing and a flat fee to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

73.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

74.     The fact that the Plan has stayed with the same recordkeeper, namely, John Hancock, over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market

for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

75. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were unreasonably high when benchmarked against similar plans.

| Year | Participants | RK Direct[7] | RK Indirect | Total Comp | $PP |
|------|-------------|-------------|-------------|------------|------|
| 2016 | 15,779 | $443,713 | $683,766 | $1,127,479 | $71.45 |
| 2017 | 21,076 | $1,190,375 | $235,229 | $1,425,604 | $67.64 |
| 2018 | 25,332 | $3,603,985 | None Reported[8] | $3,603,985 | $142.27 |
| 2019 | 28,430 | $2,756,255 | None Reported[8] | $2,756,255 | $96.95 |
| 2020 | 24,254 | $1,967,690 | None Reported[8] | $1,967,690 | $81.13 |

76. By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

77. At all times during the Class Period, the Plan had over 15,000 participants making it eligible for some of the lowest fees on the market. Because the Plan overpaid for RKA costs each year of the Class Period, we can look at one year as an exemplar to demonstrate circumstantial evidence of imprudence.

78. Looking at recordkeeping costs for other plans of a similar size as of 2018 shows that the Plan was paying higher RKA costs than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding RKA fees. The chart below analyzes a few well managed plans having conservatively more than 13,000 participants with assets

---

[7] Both Direct and Indirect Costs are taken from the Plan's 5500 filing bearing service codes 15, 37, 60, 62, and 64 which are the most common recordkeeping codes, as discussed above.

[8] No indirect costs were reported on the Plan's 5500 filing. However, there may have been additional revenue sharing tied to the investments in the Plan not reported here. Once the true amount of revenue sharing is known, this number may increase for all years of the Class Period.

20

between approximately $300 million dollars and $1 billion dollars in assets under management:

| Comparable Plans' RKA Fees Paid | | | | |
|---|---|---|---|---|
| Plan Name | Partici-pants | Assets Under Management | RKA Costs /pp[9] | Record-keeper |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | **$35** | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | **$35** | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | **$33** | Fidelity |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | **$26** | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |

79.     There are examples of other same-sized or smaller plans paying much less for recordkeeping and administration costs during the same time period:

| Year | Plan Name | Assets | Participants | Part Fee[9] | Recordkeeper |
|---|---|---|---|---|---|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2013 | HealthFirst Profit Sharing 401(k) | $103 million | 3,104 | $37.42 | Verisight, Inc. |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2014 | Expeditors International of | $343 million | 6,334 | $38.44 | Milliman |

---

[9] In order to keep this comparator analysis consistent with the Reyes analysis above, RKA costs in the chart are derived, in the same manner as for Reyes, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as "15," "37," "60," "62," "64" and/or "65," are some examples, but are not limited to, these codes which as discussed above are the most common codes associated with recordkeeping. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

| Year | Plan Name | Assets | Participants | Part Fee[9] | Recordkeeper |
|---|---|---|---|---|---|
| | Washington, Inc. 401(k) Plan | | | | |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare Retirement Plan | $107,652,510 | 9,750 | $28 | Great-West |
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2018 | Fortive Retirement Savings Plan | $1,297,404,611 | 13,502 | $35 | Fidelity |
| 2018 | DHL Retirement Savings Plan | $806,883,596 | 14,472 | $33 | Fidelity |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | $939,399,569 | 18,674 | $25 | Vanguard |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |
| 2019 | Michelin 401(k) Savings Plan | $2,817,613,558 | 16,335 | $36 | Vanguard |

80.     Further, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[10]

_____

[10] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market

81.     Thus, the Plan, with over 25,000 participants and over $1 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present.

82.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### (2) The Target Date Funds and Other Funds Offered by the Plan Deprived Participants of Meaningful Returns and Exposed Them to Unexpected Risks

83.     Many 401(k) plans offer a group of investments commonly known as a target date suite. Target date suites typically consist of several funds from the same family of funds focusing on an individual's anticipated date of retirement. Typically, a target date suite will consist of funds that consider an individual's anticipated retirement date at 5-year intervals, depending on the individual. For example, there may be six funds in the same target date suite but one of those funds may be focused on older investors with an anticipated retirement date of 2030, for example and another fund in the same suite may be focused on younger investors with an anticipated retirement date in 2055.

84.     The Financial Industry Regulatory Authority, commonly known as FINRA, which acts as the watchdog for the financial industry, describes target date funds as follows:

> Target-date funds are designed to help manage investment risk. You pick a fund with a target year that is closest to the year you anticipate retiring, say a "2050

---

rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

Fund." The closer a fund gets to its target date, the more it focuses on assets that traditionally have a lower risk profile, such as fixed income, cash and cash equivalents. This shift across asset classes is called a "glide path." A fund's glide path is designed to reduce investment risk over time—but glide paths can vary considerably from fund to fund.

Save the Date: Target-Date Funds Explained published by FINRA dated April 21, 2022, available on its website at https://www.finra.org/investors/insights/save-date-target-date-funds-explained. Last accessed on May 4, 2022.

85. Further, a target date suite typically will consist of a mix of different underlying funds that have different risk and return profiles. As a person's anticipated retirement date approaches, the fund is designed to reduce the percentages of the higher risk investments to make fund more stable given the nearing retirement date. Conversely, the fund targeted at investors with a 2060 retirement date will have more risk with a potential for greater returns to help a younger investor build his or her nest egg. *See, Id.*

86. Generally, most target funds will consist of several underlying mutual funds some with higher risk and some that are lower risk for those closer to retirement. For example, the 2030 fund might consist of the same 10 mutual funds as the 2060 fund but the 2030 fund will have a greater percentage of its assets invested in the funds with lower risk since a person anticipating retiring in 2030 will want to have a lower risk investment to ensure funds will be available for their retirement.

87. Here, the Defendants decided to create their own suite of target date funds, a practice which is baffling giving the number of excellent target date suites available on the market. Commercially available target dates are generally managed by individuals with many years of experience in the investment industry. However, the instant funds created by the Defendants failed to meaningfully change their risk return profile as an investor grows closer to retirement age, which, as discussed above, is something which is expected of a target date suite. Instead, the target

date suite created by the Defendants appear to have a generally similar risk return profile for the 2030 fund as it does for the 2035 fund. Given this, it was clear breach of fiduciary duty to have created these poorly performing target date funds instead of choosing from the many better performing target date suites with expected stability for each expected retirement date.

88.     The Defendants, as fiduciaries to the Plan, should have recognized that their target date funds were not functioning as expected and should have replaced them at the beginning of the Class Period. The chart below analyzes the performance of properly performing target date funds as compared to the Reyes target date suite. These alternates are just a few from many that could have been selected for the Plan.

| | 3YR A/O 3Q 2021 | 5YR A/O 3Q 2021 |
|---|---|---|
| Reyes Target 2030 | 10.01% | 10.47% |
| Fid Free 2030 K | 11.19% | 11.39% |
| Fid Free 2030 K6 | 11.32% | N/A |
| FIAM Bl TD 2030 Q (CIT) | 11.44% | 11.39% |
| FIAM Bl TD 2030 S (CIT) | 11.51% | 11.45% |
| TRowe Pr Ret I 2030 I | 12.19% | 11.87% |
| Am 2030 TGT Date Ret R6 | 11.10% | 11.12% |
| St Street Tgt Ret 2030 K | 11.77% | 11.20% |
| | | |
| Reyes Target 2035 | 10.87% | 11.42% |
| Fid Free 2035 K | 12.31% | 12.76% |
| Fid Free 2035 K6 | 12.47% | N/A |
| FIAM Bl TD 2035 Q (CIT) | 12.68% | 12.79% |
| FIAM Bl TD 2035 S (CIT) | 12.72% | 12.87% |
| TRowe Pr Ret I 2035 I | 12.95% | 12.68% |
| Am 2035 TGT Date Ret R6 | 12.16% | 12.79% |
| St Street Tgt Ret 2035 K | 12.62% | 11.84% |
| | | |
| Reyes Target 2040 | 11.59% | 12.12% |
| Fid Free 2040 K | 13.10% | 13.36% |
| Fid Free 2040 K6 | 13.27% | N/A |
| FIAM Bl TD 2040 Q (CIT) | 13.47% | 13.36% |
| FIAM Bl TD 2040 S (CIT) | 13.54% | 13.45% |
| TRowe Pr Ret I 2040 I | 13.64% | 13.40% |
| Am 2040 TGT Date Ret R6 | 13.37% | 13.52% |
| St Street Tgt Ret 2040 K | 12.56% | 12.37% |

| | | |
|---|---|---|
| Reyes Target 2045 | 11.93% | 12.45% |
| Fid Free 2045 K | 13.10% | 13.33% |
| Fid Free 2045 K6 | 13.27% | N/A |
| FIAM Bl TD 2045 Q (CIT) | 13.47% | 13.36% |
| FIAM Bl TD 2045 S (CIT) | 13.53% | 13.45% |
| TRowe Pr Ret I 2045 I | 14.03% | 13.76% |
| Am 2045 TGT Date Ret R6 | 13.57% | 13.79% |
| St Street Tgt Ret 2045 K | 12.81% | 12.82% |
| | | |
| Reyes Target 2050 | 12.14% | 12.61% |
| Fid Free 2050 K | 13.10% | 13.33% |
| Fid Free 2050 K6 | 13.26% | N/A |
| FIAM Bl TD 2050 Q (CIT) | 13.47% | 13.88% |
| FIAM Bl TD 2050 S (CIT) | 13.54% | 13.45% |
| TRowe Pr Ret I 2050 I | 14.06% | 13.77% |
| Am 2050 TGT Date Ret R6 | 13.57% | 13.79% |
| St Street Tgt Ret 2050 K | 13.09% | 12.99% |
| | | |
| Reyes Target 2055 | 12.26% | 12.66% |
| Fid Free 2055 K | 13.09% | 13.33% |
| Fid Free 2055 K6 | 13.25% | N/A |
| FIAM Bl TD 2055 Q (CIT) | 13.47% | 13.38% |
| FIAM Bl TD 2055 S (CIT) | 13.54% | 13.45% |
| TRowe Pr Ret I 2055 I | 14.06% | 13.79% |
| Am 2055 TGT Date Ret R6 | 13.77% | 13.98% |
| St Street Tgt Ret 2055 K | 13.05% | 12.99% |
| | | |
| Reyes Target 2060 | 12.25% | N/A |
| Fid Free 2060 K | 13.08% | 13.31% |
| Fid Free 2060 K6 | 13.48% | N/A |
| FIAM Bl TD 2060 Q (CIT) | 13.49% | 13.37% |
| FIAM Bl TD 2060 S (CIT) | 13.53% | 13.47% |
| TRowe Pr Ret I 2060 I | 14.06% | 13.78% |
| Am 2060 TGT Date Ret R6 | 13.78% | 13.97% |
| St Street Tgt Ret 2060 K | 13.09% | 13.00% |

89.     As can be seen from the chart above, the Reyes target date funds underperformed the alternatives by, in most case, more than one percent at the three- and five-year mark. What's worse, the Reyes target date suite did not perform as one would expect a target date suite to perform.

90.     As would be expected of a target date suite, the further an investor is away from retirement one would expect to see a higher return since, as discussed above, target date suites

should be changing their risk profile based on an expected retirement date. However, the Reyes target date suite had minimal changes in returns. For example, the Reyes Target 2030 fund had a return of 10.01% at the three-year mark and this return moved only to 10.87% for the Reyes 2035 fund at the three year mark, only a .86% difference. Looking at one of the better performing alternatives, the Fidelity Freedom 2030 K6 fund had a return of 11.32% at the three year mark but the Fidelity Freedom 2035 K6 fund had a return of 12.47% at the three year mark leaving a 1.15% difference which indicates that the fund's risk balance is being adjusted in a meaningful way.

91. In addition, some of the funds in the Plan had the worst return history of its peers. For example, but not limited to, the Hartford Mid Cap Class Y performed worse than 94% of hundreds of its peers at the 3-year mark and worse than 81% of its peers at the five year mark. The Defendants should have recognized this performance issue and replaced this fund at the beginning of the Class Period, if not sooner.

92. Plan participants were deprived of these greater returns and the Plan should be made whole by requiring the Defendants to repay the difference between the returns from their underperforming target date suite with one of the many properly performing target date suites and funds listed above.

## FIRST CLAIM FOR RELIEF
### Breaches of the Fiduciary Duty of Prudence
### (Asserted against the Committee)

93. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

94. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

95.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

96.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to negotiate reasonable Plan recordkeeping fees.

97.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

98.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

99.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Reyes and the Board Defendants)

100.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

101.     Reyes and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

102.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

103.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

104.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered

significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

105.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

106.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.  An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.  Such other and further relief as the Court deems equitable and just.

Dated:  June 7, 2022                    **CAPOZZI ADLER, P.C.**

                                        /s/ *Donald R. Reavey*
                                        Donald R. Reavey, Esquire
                                        PA Attorney ID #82498
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        E-mail:  donr@capozziadler.com
                                        Telephone:  (717) 233-4101
                                        Fax:  (717) 233-4103

                                        /s/ *Mark K. Gyandoh*
                                        Mark K. Gyandoh, Esquire
                                        PA Attorney ID # 88587
                                        **CAPOZZI ADLER, P.C.**
                                        312 Old Lancaster Road
                                        Merion Station, PA 19066
                                        E-mail:  markg@capozziadler.com
                                        Telephone:  (610) 890-0200
                                        Fax (717) 233-4101

                                        Counsel for Plaintiffs and the Putative Class