IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MATTHEW J. DAYAK, JEFFREY S.
JACOBS and THOMAS DORE,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

       v.

REYES HOLDINGS, LLC, THE
BOARD OF DIRECTORS OF REYES
HOLDINGS, LLC, and REYES
HOLDINGS, LLC EMPLOYEE
BENEFITS COMMITTEE,

          Defendants.

No. 22-cv-02974

Judge John F. Kness

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Dkt. 25.). For the reasons provided in the accompanying Memorandum Opinion and Order, Defendants' motion, well-argued as it is, must be denied.

**I.    BACKGROUND**

    **A.    The Parties**

Plaintiffs Matthew J. Dayak, Jeffrey S. Jacobs, and Thomas Dore bring this putative class action lawsuit under Sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1109, 1132. Plaintiffs bring the

action on behalf of the Reyes Holdings 401(k) Thrift Plan[1] (the "Plan"), themselves, and all others similarly situated. (Dkt. 21 ¶ 1.) Plaintiffs are individuals who participated in the Plan by investing in some of the options offered by the Plan. (*Id.* ¶¶ 19–21.) Defendants are the Plan's fiduciaries: Reyes Holdings, LLC ("Reyes"); the Board of Directors of Reyes and its members (the "Board"); and the Reyes Employee Benefits Committee and its members (the "Committee"). (*Id.* ¶ 1.) Plaintiffs allege that Defendants, who are fiduciaries of the Plan, have breached their fiduciary duties of loyalty and prudence. (*Id.* ¶¶ 1–2.)

Defendant Reyes is a company that produces and distributes food and beverage products. (*Id.* at 7 n.6, ¶ 24.) Reyes is the sponsor of the Plan at issue in this action. (*Id.* ¶ 24.) Acting through the Board, Reyes appointed the Committee to manage the Plan's investments. (*Id.* ¶¶ 25, 28, 31.) Reyes instructed the Committee to "ensure that the investments available to Plan participants are appropriate, had no more expenses than reasonable and performed well as compared to their peers." (*Id.* ¶ 25.) Plaintiffs argue that the Committee "fell well short of these fiduciary goals." (*Id.*)

## B. The Plan

The Plan is a "defined contribution" or "individual account" plan that provides retirement benefits to Reyes employes. (Dkt. 21 ¶ 41.) This means that the Plan provides for individual accounts for each participant, and benefits are based solely on the amount contributed to those accounts plus any income, expenses, gains, losses,

---

[1] Plaintiffs clarify that the Plan is a legal entity that can be sued. But in breach of fiduciary duty cases, the Plan cannot be a party. As a result, Plaintiffs bring this action on behalf of the Plan, and the relief Plaintiffs request is for the benefit of the Plan and its participants. (*See* Dkt. 21 at 1 n.3.)

and any forfeitures that may be allocated to each participant's account. (*Id.*) Thus, retirement benefits under the Plan are "based solely on the amounts allocated to each individual's account." (*Id.*)

Participants can add several types of contributions to their account, including: (1) salary deferral; (2) Roth 401(k); (3) after-tax; (4) catch-up; (5) rollover; (6) discretionary profit-sharing; and (7) employer matching. (*Id.* ¶ 43.) With regard to employee contributions, participants may contribute up to 50% of their annual compensation on a pre- or post-tax basis. (*Id.* ¶ 44.) With regard to Reyes matching contributions, Reyes will generally contribute "an amount equal to 50%" of participants' deferrals up to a maximum contribution of "up to 10%" of the participants' deferrals. (*Id.*) When participants make a contribution to the Plan, they are immediately vested in the Plan for those contributions plus any earnings on the contributions. (*Id.* ¶ 48.) Contributions made by Reyes are subject to a five-year vesting schedule. (*Id.*)

Plaintiffs allege that Reyes enjoys benefits by providing matching contributions to its Plan participants. One such benefit is that Reyes is permitted to take tax deductions, and another benefit is that the offering of retirement plans attracts new employees and reduces turnover. (*Id.* ¶¶ 45–46.)

The Committee is tasked with determining the appropriateness of the Plan's investment offerings, and monitoring investment performance. (*Id.* ¶ 49.) The Committee made several funds available to Plan participants for investment during

3

each year of the Class Period.[2] (*Id.* ¶ 50.) All administrative and recordkeeping expenses for the Plan were paid using a "combination of charges to the participants and Plan assets." (*Id.* ¶ 52.)

According to Plaintiffs, the Plan had between $645 million and $1.4 billion in assets during the Class Period. (*Id.* ¶ 10.) Plaintiffs allege that these assets qualify the Plan as one of the largest plans in the United States, meaning it had "substantial bargaining power regarding the fees and expenses that were charged against participants' investments." (*Id.* ¶ 11.) Along with high assets, the Plan has a high number of participants: between 15,779 and 24,254 during the Class Period. (*Id.* ¶ 12.) Accordingly, Plaintiffs argue, the Plan had "substantial bargaining power to negotiate favorable recordkeeping and administration fees." (*Id.*)

## C.    The Plan's Fees

Plaintiffs allege that Defendants breached their fiduciary duties by failing to administer the Plan in a prudent manner, leading to unreasonably high Plan fees. (Dkt. 21 ¶¶ 53–59.) Specifically, Plaintiffs allege that Defendants' faulty decision-making resulted in Defendants "(1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs, that wasted the assets of the Plan and the assets of participants because of unnecessary

---

[2] Plaintiffs define the Class Period as the time between June 7, 2016 through the date of judgment. (Dkt. 21 at 1 n.3, ¶ 34.)

costs." (*Id.* ¶ 59.)

1. *Excessive Recordkeeping and Administrative Costs.*

Plaintiffs first allege that one indication that Defendants breached their duty of prudence was the excessive recordkeeping and administrative fees that Plan participants were required to pay. (*Id.* ¶ 60.)

"Recordkeeping" is a catchall term to describe the suite of administrative services provided to a contribution plan by the plan's "recordkeeper." (*Id.* ¶ 61.) All national recordkeepers for large plans offer two types of recordkeeping services: "buffet" or "a la carte." A "buffet" style of service provides several recordkeeping services (such as transaction processing, administrative services, participant communications, plan document services, plan consulting services, accounting and audit services, and compliance support) for one price regardless of what services are chosen or utilized by the particular contribution plan. (*Id.* ¶¶ 62–63.) Under this "buffet" style, which is also referred to as a "bundled" style, the services chosen by a plan do not affect the amount charged by the recordkeepers for the services. (*Id.*) Under an "a la carte" style of service, recordkeepers charge separate, additional fees for the specific services provided to each plan depending on the "conduct of individual participants and the usage of the services by individual participants." (*Id.* ¶ 64.)

The cost of recordkeeping services usually depends on the number of participants in a plan; thus, most recordkeeping services are charged on a per-participant basis. (*Id.* ¶ 67.) These expenses can either be paid from a plan's assets directly, or indirectly through "revenue sharing." (*Id.* ¶ 68.) Revenue sharing

payments are paid from investments within a plan directly to the recordkeeper. (*Id.*) Plaintiffs allege that revenue sharing can be "devastating" for plan participants because it is a way to hide fees that participants are never aware of. (*Id.* ¶ 70.)

John Hancock Retirement Plan Services ("Hancock") served as the Plan's recordkeeper throughout the Class Period. (*Id.* ¶ 66.) Hancock provided both "buffet" and "a la carte" style recordkeeping services. Hancock provided "ordinary" services for the Plan during the Class Period. (*Id.*) These services were paid through revenue sharing, which Plaintiffs allege "resulted in a worst-case scenario for the Plan's participants because it saddled [them] with above-market recordkeeping fees." (*Id.* ¶ 72.)

Plaintiffs suggest that Defendants likely did not regularly conduct a Request for Proposal ("RFP") to determine if the recordkeeping expenses were too high in relation to other similar plans. (*Id.* ¶¶ 73–74.) Plaintiffs argue that the Plan's recordkeeping fees were "unreasonably high" in comparison to similar plans. (*See id.* ¶¶ 74–79.) Plaintiffs provide charts showing that the Plan's recordkeeping fees ranged from $67 to $142 per participant between 2016 and 2020, whereas other similarly situated plans' fees were usually no more than $35 per plan participant. (*Id.*) Plaintiffs contend that the Plan, at its size and bargaining power, should have been able to negotiate a recordkeeping costs "in the low $20 range." (*Id.*)

### 2. *Underperforming Target Date Funds.*

Plaintiffs next allege that the Plan's target date funds "deprived participants of meaningful returns and exposed them to unexpected risks." (Dkt. 21 at 23.) A

6

target date suite is a group of investments commonly offered by 401(k) plans consisting of "several funds from the same family of funds focusing on an individual's anticipated date of retirement." (*Id.* ¶ 83.) Target date suites typically consist of funds that consider an individual's anticipated retirement date at five-year intervals. (*Id.*) The funds in these suites are designed to manage investment risk, because as an individual's anticipated retirement date approaches, the fund reduces higher risk investments so the fund is more stable as retirement approaches. (*Id.* ¶¶ 84–85.) Conversely, individuals with a later retirement date have riskier target date funds that have a potential for greater returns. (*Id.* ¶ 85.) There are many target date suites commercially available for contribution plans to use that are managed by experts with years of experience in the investment industry. (*Id.* ¶ 87.)

Plaintiffs allege that Defendants, instead of selecting a commercially available target date suite, created their own suite of target date funds. (*Id.*) Plaintiffs allege that these funds "failed to meaningfully change their risk return profile as an investor grows closer to retirement age." (*Id.*) Instead, the funds "appear to have a generally similar risk return profile" across five-year intervals. (*Id.*) Plaintiffs provide a table comparing the performance of "properly performing" target date suites to the Plan's target date suite. (*Id.* ¶ 88.) The table shows the Plan's target date funds underperforming the alternatives by "more than one percent." (*Id.* ¶ 89.) Plaintiffs point out that the Plan's target date suite had a "minimal change in returns" between funds with different expected retirement dates, which is unusual considering risk profiles should be changing depending on the expected retirement date. (*Id.* ¶ 90.)

7

Plaintiffs state that the funds in the Plan had the "worst return history" of its peers. (*Id.* ¶ 91.) Plaintiffs contend that Plan participants "were deprived of these greater returns" because of the "underperforming target date suite" Defendants chose. (*Id.* ¶ 92.)

### D. Plaintiffs' Claims for Relief

Through their first amended complaint, Plaintiffs bring a two-count putative class action against Defendants. In Count I, Plaintiffs allege a breach of the fiduciary duty of prudence against the Committee. (Dkt. 21 ¶¶ 93–99.) Plaintiffs argue that the Committee Defendants were subject to fiduciary duties including "managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." (*Id.* ¶ 95.) Plaintiffs allege that the Committee breached those duties by failing to make investment decisions based on the best interest of the Plan's participants, failing to investigate the availability of lower-cost funds, and failing to negotiate reasonable recordkeeping fees. (*Id.* ¶ 97.)

In Count II, Plaintiffs allege that Reyes and the Board breached their duty to monitor the Committee. (*Id.* ¶¶ 100–06.) Specifically, Plaintiffs contend that Reyes and the Board failed to (1) monitor and evaluate the Committee's performance or have a system for doing so; (2) monitor the processes by which Plan investments were evaluated; and (3) remove Committee members whose performance was inadequate.

(*Id.* ¶ 104.)

Defendants now move to dismiss Plaintiffs' first amended class action complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. 25.)

## II.   LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up).

As the Seventh Circuit has emphasized, a plaintiff need not "lay out every element or ingredient" of a claim to survive a Rule 12(b)(6) motion. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336 (7th Cir. 2024). Such "details and proof" come later, and all a plaintiff must do is "state a grievance." *Id.* at 1338. In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal

9

conclusions are not. *Id.* at 678–79.

## III. DISCUSSION

In ERISA class actions such as this one, Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). Courts must apply a "careful, context-specific scrutiny" of the complaint. *Id.* But a plaintiff alleging a breach of fiduciary duty need not plead that claim "with a degree of precision only possible after discovery," because the plaintiff generally lacks "the inside information necessary to make out their claims in detail unless and until discovery commences. *Coyer v. Univar Sols. USA Inc.*, No. 22 CV 0362, 2022 WL 4534791, at *3 (N.D. Ill. Sept. 28, 2022) (citing *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)). Courts must also "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," because the "circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." *Albert*, 47 F.4th at 577 (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)).

### A. Count I: Breach of Duty of Prudence

ERISA's duty of prudence requires a plan fiduciary to "discharge his duties . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The duty of prudence first requires a fiduciary to

10

regularly review funds at regular intervals to determine whether they are prudent investments. *See Hughes*, 63 F.4th at 626. This duty also requires a fiduciary to ensure incurred costs are "reasonable" and "appropriate." *Id.* at 627. Plaintiffs allege in Count I that the Committee breached its duty of prudence by charging excessive recordkeeping fees and selecting underperforming target date funds. (Dkt. 21 ¶¶ 93–99.)

Defendants first argue that Count I must be dismissed because Plaintiffs have not sufficiently pleaded allegations providing enough context to show Defendants have plausibly breached their duty of prudence. As to Plaintiffs excessive recordkeeping fee allegations, Defendants argue that Plaintiffs used incorrect calculations, compared plans without meaningful benchmarks, and speculated about Defendants' actions. (Dkt. 26 at 10–15.) As to Plaintiffs' target date funds allegations, Defendants argue that Plaintiffs' "threadbare," "hindsight-based," and "cherry-picked" allegations cannot support an inference of imprudence. (*Id.* at 15–18.) But as explained below, the Court holds that Plaintiffs have plausibly alleged Defendants breached their duty of prudence.

### 1. *Recordkeeping Fee Allegations*

#### (a) Incorrect Recordkeeping Fee Calculations

Plaintiffs allege that participants of the Plan paid between $67.64 and $142.27 annually for recordkeeping fees. (Dkt. 21 ¶ 75.) Plaintiffs state that they calculated these numbers from Defendants' publicly available Form 5500, which is a report that 401(k) plans must file annually with the federal government. (*Id.* at 16 n.8, 20 n.9,

¶¶ 66, 75.) In a footnote, Plaintiffs explain that Defendants revised their Form 5500 for 2018 and 2019 to reduce the amount of direct costs reported, but that it was unclear from these revisions how the costs were actually redistributed. (*Id.* at 20 n.9.) Plaintiffs argue that even though they do not clearly know how the revisions affected the recordkeeping costs, "the per participant fees [after the revisions] would still be excessive when compared to fees paid by comparable plans." (*Id.*)

Defendants challenge Plaintiffs' reliance on "wrong" recordkeeping fee calculations, arguing that Plaintiffs do not provide any support for their "baseless" allegations about how the revisions to the Form 5500s affect the distribution of the fees. (Dkt. 26 at 11.) Plaintiffs readily concede that they cannot properly calculate the recordkeeping fees based on the Form 5500s.

But as Plaintiffs argue, a miscalculation based on lack of information does not defeat Plaintiffs' otherwise well-pleaded claim. (*See* Dkt. 28 at 13.) Plaintiffs add that they lacked details on the proper calculations, and they allege that the proper calculations would have still resulted in excessive recordkeeping fees. A miscalculation thus will not defeat Plaintiff's excessive recordkeeping fees claim. *See Pinnell v. Teva Pharms. USA, Inc.*, No. 19-5738, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020) (excessive recordkeeping fees allegation deemed plausible "despite the participants' initial miscalculation based on lack of information").

Defendants add that any indirect compensation Plaintiffs argue are included in the Plan's fees should not be counted because these "revenue sharing fees are frequently rebated back to Plan participants." (*Id.*) But Defendants do not argue that

such a rebate happened here. Plaintiffs' inclusion of indirect compensation is thus appropriate at this stage. Accordingly, Defendants' motion to dismiss Count I is denied to the extent Defendants rely on miscalculated recordkeeping fees.

(b) Comparator Plans as Benchmarks

Defendants next argue that the six other retirement plans cited by Plaintiffs "do not provide meaningful benchmarks" to compare to the Plan. (Dkt. 26 at 11.) Defendants contend that Plaintiffs do not show how the recordkeeping services provided by Hancock to the Plan are equivalent to the six comparator plans with six different recordkeepers. (*Id.* at 12.)

Defendants support this argument by citing *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022). *Albert* upheld the dismissal of a duty of prudence claim where the plaintiff compared its plan to nine other plans that had supposedly more prudent recordkeeping fees. *Id.* at 579. As the Seventh Circuit concluded, the plaintiff did not provide enough context about the comparator plans' fees in relation to the services they provided as compared to the fees and services provided by the plaintiff's plan. *Id.* at 579–80. *Albert*'s plaintiff thus failed to plausibly assert a breach of duty of prudence claim. *See also Baumeister v. Exelon Corp.*, No. 21-cv-6505, 2022 WL 4477916, at *2 (N.D. Ill. Sept. 22, 2022) (dismissing duty of prudence claim because plaintiffs "plead[ed] no facts to show whether the selected comparators receive recordkeeping services of a similar nature and quality to those offered by the [plaintiffs'] recordkeeper"); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (same); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir.

13

2022) (same). Defendants argue that, as in *Albert*, Plaintiffs' failure to compare the services provided to the Plan by Hancock to the services provided to other plans by other recordkeepers means that Plaintiffs have insufficiently pleaded a breach of the duty of prudence.

Plaintiffs do not dispute that *Albert* and the other cases Defendants cite provide the correct standard to determine whether a recordkeeping-fee-based claim has been adequately pleaded. But Plaintiffs contend that Defendants' argument is a "red herring" because Plaintiffs have alleged facts sufficiently comparing Hancock and the Plan to the comparator plans. (Dkt. 28 at 14.) Plaintiffs cite several allegations they argue sufficiently compare the plans. First, Plaintiffs compare codes corresponding to general recordkeeping services listed in the Plan's Form 5500 to those same codes found in other similar 401(k) plan Form 5500s. (Dkt. 21 at 21 n.11, ¶¶ 66, 78; Dkt. 28 at 15.) Plaintiffs explain that they rely on this "circumstantial evidence" and could not make more detailed comparisons between plans because "recordkeeping service agreements are not publicly available." (Dkt. 28 at 15–16.) Second, Plaintiffs allege that the Plan had high assets and thousands of participants, making it a large plan with "substantial bargaining power." (Dkt. 21 ¶¶ 10–12, 67, 73; Dkt. 28 at 16–17.) This bargaining power, according to Plaintiffs, should have enabled the Plan to "negotiate low record keeping and administration fees." (Dkt. 28 at 17.) Third, Plaintiffs allege that the cost of recordkeeping services often depends on the number of participants in a plan, regardless of services provided. (*Id.*; Dkt. 21 ¶ 67.)

14

These allegations provide enough context to suggest plausibly that the comparator plans provide an appropriate benchmark for the Plan's recordkeeping fees. *Albert* requires a "context-sensitive scrutiny" of the allegations that provide enough "context [to] move th[e] claim from possibility to plausibility." *Albert*, 47 F.4th at 580. Plaintiffs' allegations meet this standard. *Compare Hughes*, 63 F.4th at 632 (plaintiff sufficiently pleaded that comparator plans provided similar quality services, which are commoditized), *and Mazza v. Pactiv Evergreen Servs. Inc.*, No. 22 C 5052, 2023 WL 3558156, at *3–4 (N.D. Ill. May 18, 2023) (sufficiently pleaded comparisons between plans, including allegations that comparator plans provide same level and quality of services), *and Coyer*, 2022 WL 4534791, at *4 (comparing recordkeeping fees by comparing Form 5500s was sufficient to plausibly allege breach of duty), *with Baumeister*, 2022 WL 4477916 at *2 (plaintiffs pleaded "no facts" showing that the comparator plans received similar recordkeeping services), *and Mateya v. Cook Grp. Inc.*, No. 22-cv-1271, 2023 WL 4608536, at *7 (S.D. Ind. June 16, 2023) (plaintiff did not allege facts "plausibly suggesting a different recordkeeper could provide the same mix of services . . . for less"), *and Probst v. Eli Lilly & Co.*, No. 22-cv-01106, 2023 WL 1782611, at *7–12 (S.D. Ind. Feb. 3, 2023) (finding plaintiff's comparisons between plans to be "wholly conclusory," non-specific, and inconsistent).

Accordingly, Defendants' motion to dismiss Count I is denied to the extent Defendants argue that the comparative plans Plaintiffs cite do not, at this pleading stage, provide meaningful benchmarks for the Plan's recordkeeping fees.

15

(c)     Conducting a Request for Proposal

Finally, Defendants argue that Plaintiffs' allegation that Defendants did not conduct an RFP is "speculative" and "insufficient to create an inference of imprudent conduct." (Dkt. 26 at 14–15.) Defendants argue that their duty of prudence does not compel them "to regularly solicit quotes or competitive bids from recordkeepers." (*Id.* at 14.) It may be true that Defendants are not required to regularly solicit quotes or bids. But Plaintiffs' allegation that Defendants did not do so here and should have done so to reduce recordkeeping fees is, in combination with Plaintiffs' other allegations, sufficient to support a claim for breach of the duty of prudence.

Accordingly, Defendants' motion to dismiss Count I is denied to the extent Defendants argue that their failure to conduct an RFP does not plausibly suggest imprudence.

### 2.     Target Date Suite Allegations

Defendants next argue that Plaintiffs' "threadbare" and "hindsight-based" allegations concerning the Reyes target date funds' performance "do not support an inference of imprudent conduct." (Dkt. 26 at 15.) Defendants make three arguments in support of this position: (1) Plaintiffs do not allege enough detailed information about the comparator funds; (2) Plaintiffs' underperformance argument is based on hindsight; and (3) Plaintiffs do not provide any information about the target date funds' risk return profile. (*Id.* at 15–18.)

Plaintiffs contend that they have alleged facts supporting that the comparison target date suites are meaningful comparators to the Reyes target date suite.

16

Plaintiffs point to an allegation that the comparator target date suites met guidelines set by the Financial Industry Regulatory Authority for "investment strategies, target date glide paths, and risk profiles." (Dkt. 21 ¶ 84; Dkt. 28 at 20.) Plaintiffs argue that they compared the Reyes funds to these "better performing" commercial funds. (Dkt. 28 at 20.) Plaintiffs also allege that the comparator funds are "commercially available," managed by experts, and maintain "expected stability." (Dkt. 21 ¶ 87.) These allegations, although thin, are enough to meet the plausibility standard at the pleading stage. And they are sufficient to infer reasonably that the comparator funds selected by Plaintiffs are sufficiently comparable to the Reyes target date fund.

As to Defendants' argument that Plaintiffs' allegations are based on hindsight knowledge, the Court can reasonably infer that Plaintiffs have alleged Defendants failed to act prudently based on investment information available to them at the time. Plaintiffs allege that the Plan's target date funds underperformed at multiple intervals over time, including at the three-year mark and then again at the five-year mark. These allegation support a plausible inference—at least at this preliminary pleading stage—that Defendants acted imprudently by failing to make changes to the Reyes target fund date after the funds underperformed at the three-year mark.

Accordingly, Defendants' motion to dismiss Count I is denied as to Defendants' argument concerning the target date funds. Count I alleging that the Committee breached its duty of prudence therefore survives Defendants' motion to dismiss.

## B.    Count II: Breach of Duty to Monitor

Plaintiffs allege in Count II that Reyes and the Board of Directors breached

17

their fiduciary duty by failing to monitor and evaluate the performance of other Plan fiduciaries. (Dkt. 21 ¶¶ 100–06.) Defendants argue that Count II must be dismissed because "it is merely derivative of" Claim I. (Dkt. 26 at 19.) Because Count I must fail, Defendants argue, Count II must also fail. (*Id.*) But the Court has held that Count I does not fail, so Count II does not fail either. Accordingly, Defendants' motion to dismiss Count II is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' first amended class action complaint (Dkt. 25) is denied.

SO ORDERED in No. 22-cv-02974.

Date: March 31, 2026

JOHN F. KNESS
United States District Judge

18